**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | |
|---|---|
| AUTO-OWNERS INSURANCE COMPANY and GEORGE M. MARTIN FAMILY INVESTMENT LTD., : : : : Plaintiffs, : : v. : : SOUTHWEST NUT COMPANY, INC. and TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA : : : : Defendants. : : | CASE NO.: 1:10-CV-009 (WLS) |

**ORDER**

Before the Court is Travelers Property Casualty Company of America's Motion for Summary Judgment (Doc. 67) and Auto-Owners Insurance Company and George M. Martin Investment LTD.'s Motion for Summary Judgment (Doc. 76). For the following reasons, Travelers Property Casualty Company of America's Motion for Summary Judgment (Doc. 67) is **GRANTED** and Auto-Owners Insurance Company and George M. Martin Investment LTD.'s Motion for Summary Judgment (Doc. 76) is **DENIED**.

**PROCEDURAL AND FACTUAL BACKGROUND**

On December 5, 2007, Southwest Nut Company, Inc., leased space in a warehouse in Camilla, Georgia (hereinafter "the Warehouse"), owned by Plaintiff

1

George M. Martin Family Investment, LTD. ("Martin").[1] (Doc. 77 ¶ 1; Doc. 68 ¶ 2.) Specifically, Southwest Nut leased four bays, Bays 1, 2, 3, and 4, comprising approximately 24,000 square feet in floor size, and associated loading dock area. (Doc. 71-2.) The Warehouse facility totals approximately 60,000 square feet and has a total of 9 Bays. (Doc. 75-1 at 10.) It appears that the portion of the Warehouse unoccupied by Southwest Nut is leased to another company, Camilla Commodity Services, Inc. (Doc. 83 at 2; *see also* Doc. 75-1 at 62-72.) Camilla Commodity's lease agreement states that it encompasses Bays 5, 6, 7, 8, and 9, comprising of 45,000 square feet in floor size, and associated loading dock area. (Doc. 75-1 at 62.)

On January 14, 2008, a fire of unknown origin damaged the Warehouse. (*Id.*) At the time of the fire, Southwest Nut had an insurance policy with Travelers, effective from September 30, 2007 to September 30, 2008. (Doc. 68 ¶ 14.) The lease agreement between Martin and Southwest Nut contained a number of provisions requiring that Southwest Nut procure various kinds of insurance in connection with its use of the Warehouse. (*See generally* Doc. 71-2 at 32-46.) Nevertheless, the Camilla Warehouse was not listed on the Statement of Values for the Travelers policy at the time of the fire. (*Id.* ¶¶ 15-16; Doc. 83 ¶ 8.) The Travelers policy includes a provision offering coverage for "[b]uildings the insured [Southwest Nut] becomes newly required to insure under a written contract" unless "the property is more specifically insured elsewhere." (Doc. 83 ¶ 9.) Even if an insured does not report the new building, coverage under this provision

---

[1] The following facts are derived from the Complaint (Doc. 1); Travelers' and Southwest Nut's Answers (Docs. 8, 10); Travelers' Statement of Undisputed Material Facts (Doc. 68) and Auto-Owners and Martin's Responsive Statement of Facts (Doc. 87); and Auto-Owners and Martin's Statement of Undisputed Material Facts (Doc. 77) and Travelers' Responsive Statement of Facts (Doc. 83), all of which were submitted pursuant to Local Rule 56; and the record in this case. Where relevant, the factual summary also contains undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits, all of which are construed in a light most favorable to Plaintiff as the nonmoving party. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); Fed. R. Civ. P. 56.

exists for a 120-day period following the acquisition. (Doc. 83 ¶ 12.) The limit of coverage for such property is $2,500,000. (Doc. 77 ¶ 10.)

On January 15, 2008, Southwest Nut informed its broker Michael Madey that there was a fire at the Warehouse. (Doc. 71-2 at 9.) On that same day, Mr. Madey informed Travelers that Southwest Nut had a lease agreement in place to lease space at the Warehouse. (Doc. 71-2 at 6.) He then stated that it seemed like Southwest Nut would qualify for the "newly acquired limits of $2.5mm." (*Id.*) Travelers then informed Plaintiff that it would need a "no loss" letter from Southwest Nut to add the Warehouse to the policy. (*Id.*) On January 15, 2008, the President of Southwest Nut, Chris Spence, informed Travelers via letter that Southwest did not suffer any losses, nor was it aware of any circumstances that may lead to any losses to the "newly added location." (Doc. 71-2 at 8.) On January 18, 2008, Travelers received a copy of the lease agreement for the Warehouse. (Doc. 71-2 at 30.) Subsequent to these communications, Travelers states that it added an endorsement to Southwest Nut's policy to add "stock coverage" for the Warehouse to the Statement of Values, with an effective date of coverage of December 1, 2007. (Doc. 83 ¶ 17.) The "stock coverage" limit provided for up to $6,000,000. (Doc. 77 ¶ 17.) Pursuant to this endorsement, Southwest Nut submitted a claim for its product and other personal property that was damaged by the fire. (Doc. 83 ¶ 18.) Travelers paid Southwest Nut approximately $57,000 for the pecan stock and other property lost in the fire. (Doc. 77 ¶ 18.)

After the fire, Auto-Owners' and Martin's representatives requested a copy of the policy from Travelers. (Doc. 77 ¶ 19; Doc. 83 ¶ 19.) Travelers did not provide a copy of the policy because Southwest Nut asked it not to. (Doc. 83 ¶ 19.) Travelers also informed Auto-Owners' representative that the policy did not contain coverage for the

3

Warehouse.  (Doc. 83 ¶ 20.)  After finally getting a copy of the policy, Auto-Owners and Martin sent Travelers demand letters, on June 4, 2009 and January 12, 2010, respectively.  (Doc. 77 ¶ 21.)  Travelers did not pay the claim or accept the demand.  (Doc. 83 ¶ 21.)

Martin was also insured through a policy with Auto-Owners, effective February 26, 2007 to February 26, 2008.  (Doc. 77 ¶ 22.)  Martin submitted a claim to Auto-Owners for the Warehouse fire.  To cover the loss of the Warehouse, Auto-Owners paid Martin $1,269,000 for the "actual cash value" of the property at the time of the loss, plus $99,600 for debris removal.  (*Id.* ¶ 24.)  Auto-Owners estimates that the replacement value of the Warehouse is currently estimated to be $2,738,623.40.  (*Id.* ¶ 26.)  The Warehouse is currently being reconstructed.  (*Id.* ¶ 27.)

Auto-Owners and Martin filed a Complaint in the above-captioned matter on January 13, 2010.  (Doc. 1.)  In the Complaint, Plaintiffs allege a breach of contract claim for damages arising from a fire loss to a Warehouse owned by Martin and leased by Southwest Nut.  (*Id.*)  Auto-Owners alleges that it is entitled to subrogation of Martin's rights to indemnification from Southwest Nut to the extent Auto-Owners has made or will make payments to Martin arising from the fire loss.  (*Id.*)  Both Southwest Nut and Travelers are named as defendants in Plaintiffs' Complaint.[2]  (*Id.*)  Plaintiff Martin, individually, also alleges a claim for bad faith against Travelers.  (*Id.*)

On March 12, 2012, Travelers moved for summary judgment as to the claims pleaded against it as a defendant.  (Doc. 67.)  According to Travelers, summary judgment in its favor is appropriate because 1) Martin is not an insured under the Travelers policy, 2) the lease between Martin and Southwest Nut did not require

---

[2] Southwest Nut has alleged a crossclaim against Travelers.  (Doc. 10.)

4

Southwest Nut to provide coverage for the loss at issue since the fire did not arise out of Southwest Nut's "use or occupancy" of the Warehouse, and 3) because the Warehouse was "more specifically insured" pursuant to the Auto-Owners policy, the Warehouse does not qualify as "Newly Constructed or Acquired Property" under the Policy. Travelers also argues that Martin's bad faith claim fails because Martin was not an insured under the policy, and even if he could otherwise maintain an action for bad faith against Travelers, the claim fails because Travelers had a reasonable basis for denying Martin's demand for coverage.

Both Martin and Auto-Owners responded in opposition to Travelers' Motion for Summary Judgment. Because Auto-Owners did not join Martin's bad faith claim against Travelers, Martin separately submitted its own response brief addressing that claim but also joining the arguments presented in Auto-Owners' response in opposition. (Doc. 86 at 2 n.1.) In opposition to Travelers' Motion, Auto-Owners and Martin argue that the lease agreement between Martin and Southwest Nut unambiguously required Southwest Nut to obtain insurance for the Warehouse, that the "newly required" provision does indeed cover the damage to the Warehouse, and that the "more specifically insured elsewhere" provision only applies to other insurance that Southwest Nut, the *insured*, may otherwise have. (*See generally id.*) Auto-Owners and Martin also argue that, despite not being listed as an insured under the Travelers policy, Martin and Auto-Owners still have the right to maintain an action against Travelers for recovery. (*Id.*) As to the bad faith claim, Martin argues 1) that Travelers failed to fully investigate Martin's claims and 2) that Travelers has asserted no reasonable grounds for denying Martin's claim. (*See generally* Doc. 88.) Travelers replied in support of its Motion on May 21, 2012. (Doc. 98.)

5

On March 12, 2012, Auto-Owners and Martin filed their own Motion for Summary Judgment. (Doc. 76.) Auto-Owners and Martin allege that they are entitled to summary judgment against Southwest Nut and Travelers because the undisputed facts show that the damages to the Warehouse were plainly covered under a policy of insurance issued by Travelers to Southwest Nut and that Plaintiffs are entitled to recover from Travelers for those damages. (*See generally id.*) Plaintiffs argue that the Warehouse qualified as "newly acquired property" under the Policy's provision that defines "Newly Constructed or Acquired Property" as "Buildings newly acquired by the insured at locations other than the insured's premises." (Doc. 76-1 at 9-10.) Even if this provision does not require, Plaintiffs state that the provision offering coverage to "[b]uildings the Insured becomes newly required to insure under a written contract" would apply. (*Id.* at 10.) Plaintiffs also restate, in more detail, the arguments made in opposition to Travelers' summary judgment motion. (*See generally id.*) Travelers filed its response in opposition to this motion on April 2, 2012. (Doc. 82.) Plaintiffs replied in support on May 3, 2012. (Doc. 92.)

The briefing on these motions has now concluded, and the Court finds that the respective Motions for Summary Judgment (Docs. 67, 76) are now ripe for review.

## DISCUSSION

I. **SUMMARY JUDGMENT STANDARD**

Pursuant to Fed. R. Civ. P. 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 322. An issue is "genuine" if the quantum and quality of proof necessary to support liability

under the claim is raised. *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). A fact is "material" if it hinges on the substantive law at issue and it might affect the outcome of the nonmoving party's claim. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *see also Allen*, 121 F.3d at 646.

On a motion for summary judgment, the Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Celotex Corp.*, 477 U.S. at 322-23. The movant bears the initial burden of showing that there is no genuine issue of material fact. *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24. Once the movant has met his burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. A judgment is appropriate "as a matter of law" when the nonmoving party has failed to meet its burden of persuading the Court on an essential element of the claim. *See Cleveland v. Policy Mgmt Sys. Corp.*, 526 U.S. 795, 804 (1999); *Celotex*, 477 U.S. at 323. To avoid summary judgment, the nonmoving party must do more than summarily deny the allegations or 'show that there is some metaphysical doubt as to the material facts." *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 418 U.S. 574, 586 (1986).

## II.   ANALYSIS

In addressing the parties' motions for summary judgment, the Court believes that the starting point of its analysis is 1) whether the lease agreement required that Southwest Nut indemnify Martin for the losses suffered to the Warehouse and 2)

7

whether the lease required Southwest Nut to provide coverage to the Warehouse for *all* losses, rather than just any losses to the portion of the warehouse Southwest used.

### A. "Entire" Warehouse Theory

Auto-Owners and Martin argue that Southwest Nut was required to indemnify Martin against any damages to the "entire" Warehouse. (Doc. 92 at 6.) The Court disagrees that the language of the agreement supports Auto-Owners and Martin's interpretation. Importantly, there is no evidence from the contract to support the notion that Southwest Nut is obligated to cover damages to the entire Warehouse.

In the "defined terms" section, section 1.01(D), of the Warehouse Lease, "[t]he Warehouse (the premises being leased hereunder)" is defined as "a refrigerated bulk commodity storage facility consisting of three cold storage bays and one dry storage bay with office [depicted as Bays 1, 2, 3 and 4 on the attached Exhibit A] comprising approximately 24, 000 square feet in floor size, and associated loading dock area." (Doc. 71-2 at 32.) A diagram of the Warehouse indicates that the Warehouse is approximately 60,000 square total feet. (Doc. 75-1 at 16.) Also, the diagram attached to the lease agreement reflects that the Warehouse is comprised of a total of 9 "bays." (Doc. 71-2 at 44.)

If Martin, as the landlord and drafter of the agreement, sought only to define the "Warehouse" in the lease agreement in terms of Bays 1, 2, 3 and 4, approximately 24,000 square feet, and associated loading dock area, there is no support for his argument that the contract was intended to bind Southwest Nut to the entire Warehouse, even to the portions that Southwest Nut did not occupy. Notably, at least 36,000 square feet of the Warehouse and Bays 5, 6, 7, 8, and 9 were never accounted for by the parties in drafting the lease agreement; these other bays were, however,

8

accounted for in Camilla Commodity's lease agreement. Thus, the Court reads the unambiguous language of the definition of "Warehouse" as reflecting the parties' intent to make the subject of the lease agreement *only* those portions of the Warehouse for which Southwest Nut occupied and would therefore be responsible. *Forsyth Cnty. v. Waterscape Servs., LLC*, 303 Ga. App. 623, 632 (2010) ("Where the terms of a written contract are clear and unambiguous, the court will look to the contract alone to find the intention of the parties."); *Griffin v. Adams*, 175 Ga. App. 715, 715 (1985) ("It is well-established that no construction of a contract is required or is even permissible when the language used by the parties is plain, unambiguous and capable of only one reasonable interpretation. In such a case, the language used is given its literal meaning, and plain ordinary words are given their usual significance.")

Moreover, the other provisions to which Plaintiffs cite in support of their "entire" Warehouse theory do not change the Court's analysis. To show that Southwest Nut is liable for the Warehouse in its entirety, Plaintiffs cite to sections 5.02 and 7.02 of the agreement. Section 5.02 states, in part:

> **Insurance Retention and Tenant's Risk: No Landlord Liability.** Tenant agrees to procure and maintain full insurance coverage for absolutely all losses, liabilities, damages, or claims that may occur in connection with Tenant's use of ***the Warehouse*** and Tenant's obligations under this Lease.

(Doc. 71-2 at 34, emphasis added). Again, as an initial matter, even if this section of the lease is read as requiring Southwest Nut to indemnify Martin for any losses suffered by the Warehouse, as defined, the term "Warehouse" only includes the portions specified in the agreement—Bays 1, 2, 3 and 4, comprising approximately 24, 000 square feet in floor size, and associated loading dock area. As the parties are well aware, the purpose of a "defined terms" section is to impute the definition of a term to any section of the

9

contract where that term may be later used, where appropriate.³  Plaintiffs may not avoid their own definition of the term "Warehouse" for the purpose of trying to expand the scope of Southwest Nut's contractual liability to areas of the Warehouse it did not occupy.

Plaintiffs also argue that section 7.02 required Southwest Nut to insure "the entire structure." (Doc. 92 at 6.)  This Court again disagrees.  Section 7.02 states, in part:

> **Tenant Responsibilities**. . . . Tenant shall be solely responsible for maintenance, repair and replacement of all other elements of, improvements to and operation of ***the Warehouse*** and its contents. Tenant is fully responsible for and will promptly pay for any damage done to (or repairs and replacements made necessary by any damage done to) personal and real property with out [sic] limitation to doors, walls, roof, foundation or equipment (including refrigeration equipment) installed at or associated with the use of ***the Warehouse***.

(Doc. 71-2 at 37, emphasis added).  Plaintiffs argue that "[t]he entire structure was part of the same 'real property.'" (Doc. 92.)  Such an argument is, however, completely at odds with the definition of "Warehouse" set forth in the policy.  In fact, in the "Memorandum of Lease," attached to the lease agreement, the "real property" is described as "[a] *portion of warehouses* located at 5630 Baggs Ferry Rd, Camilla, Georgia 31730." (Doc. 71-2 at 45, emphasis added.)  This is evidence *within the agreement itself* showing that the "real property," in terms of the lease agreement, was not intended to encompass the "entire structure."   Thus, instructed by the "Defined Terms" section of the lease agreement, the Court finds that if Southwest Nut is liable for any damages, said liability only extends to the portions of the Warehouse that

---

³ Martin appears to have understood the impact that "defined terms" would have on the agreement.  In the "Memorandum of Lease" section of the lease agreement, the Martin-Southwest Nut agreement makes clear that "defined terms used herein with their initial letters capitalized which are specifically defined in the Lease [s]hall have the same meanings herein as are set forth in the Lease." (*See* Doc. 71-2 at 45.)

Southwest Nut rented and occupied, *to wit*, the sections of the Warehouse identified in the lease agreement.

### B. The Lease's Indemnification Provisions

Plaintiffs argue that the lease agreement required that Southwest Nut insure the Warehouse. In support of this argument, Plaintiffs point to sections 5.02 and 9.03 of the lease agreement, which state, in part:

> **§ 5.02. Insurance Retention and Tenant's Risk: No Landlord Liability.** Tenant agrees to procure and maintain full insurance coverage for absolutely all losses, liabilities, damages, or claims that may occur in connection with Tenant's use of the Warehouse and Tenant's obligations under this Lease.
>
> **§ 9.03. Fire or Other Casualty and Personal Property Insurance.** Tenant agrees that it will at all times during the term of this Lease insure and keep in effect on the Warehouse and contents fire, extended coverage and all other endorsements to cover the full range of losses for which Tenant is responsible hereunder.

(Doc. 71-2 at 33, 38.) Plaintiffs argue that, regardless of the cause of the fire and regardless of fault, these provisions mandate that Southwest Nut is liable for damages to the Warehouse. First, as noted previously, the Court does not find that the lease agreement provides for any Southwest Nut liability beyond the scope of the areas it leased. Second, since the Court has already concluded that lease agreement does not apply to other areas of the Warehouse, the Court does not read these liability provisions as deeming Southwest Nut liable for *anything* that might happen *anywhere* in the Warehouse.

Specifically, section 5.02 states that Southwest Nut would procure insurance for "absolutely all losses, liabilities, damages, or claims that may occur in connection with *Tenant's use of the Warehouse*." In the "Defined Terms" section, "permitted use" is defined as follows: "The Warehouse may be used by the Tenant only for bulk food

11

product storage and for any other activities incidental or related thereto." Reading both of these sections of the lease agreement, in conjunction with the Warehouse definition as only including those portions of the Warehouse rented by Southwest Nut, the Court does not find that the lease agreement was intended to make Southwest Nut liable for losses to the Warehouse *without regard* for whether those losses were incurred through Southwest Nut's "use of the Warehouse."

It is axiomatic that a contract is supposed to be considered on the whole in arriving to the construction of any part. *Georgia Farm Bureau Mut. Ins. Co. v. Ray*, 148 Ga. App. 85, 86 (1978). In drafting the agreement, Martin chose to qualify the language in section 5.02 with the words "losses . . . that may occur in connection with the *Tenant's use of the Warehouse.*" If Martin, as the drafter, sought to make Southwest Nut responsible for any damage occurring, without regard for whether it occurred through use, he should have omitted that contractual language. Since he did not, and this Court finds that the contract language unambiguously puts Southwest Nut only on the hook for losses associated with its use of the Warehouse, Martin may not now argue that he intended that Southwest Nut incur liability for losses not arising out of its use. *See, e.g., In re Club Assocs.,* 951 F.2d 1223, 1231 n.10 (11th Cir. 1992) (noting that, if drafter wanted a contractual provision to include certain language, they should have included said language in the contract; because they did not, the drafter "must abide by the contract provision that it prepared and executed").

Plaintiffs argue that the additional statement, "Tenant's obligations under this lease," broadens the scope of Southwest Nut's liability to losses not necessarily occurring in connection with Southwest Nut's use of the property. (Doc. 86 at 6.) The Court just does not agree. Specifically, the clause sought to include "obligations under this lease."

This means that for the obligation to manifest, it must still have some basis in the lease. Even if this clause is considered a "catchall" provision for all other losses that might not arise out of Southwest Nut's use of the Warehouse, the Court finds no policy provision in the lease agreement creating an obligation on the part of Southwest Nut to incur liability for losses 1) occurring in areas of the Warehouse not identified in the lease agreement and 2) not arising out of Southwest Nut's "use of the Warehouse."  Thus, Martin's alleged catchall provision cannot capture what does not exist.

Moreover, the Court finds the clause—"Tenant's obligations under this lease"—to be ambiguous.  The rules of contract interpretation require that ambiguous contract provisions should be construed against Martin as the draftsman. *See Club Assocs.*, 951 F.2d at 1231 ("As a general rule the provisions of a contract will be construed against the draftsman . . . .") (citing *Stern's Gallery of Gifts, Inc. v. Corporate Property Investors, Inc.*, 176 Ga. App. 586, 593 (1985)); *see also* O.C.G.A. § 13-2-2 ("If the construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred").  Such a rule is definitely applicable here where the drafter (Martin) is requesting that the Court apply the ambiguous provision to impose substantive liability that does not emanate from the lease agreement.  Therefore, the clause—"Tenant's obligations under this lease"—may not be used by Martin to create liability on the part of Southwest Nut, under these facts.

Simply put, application of the lease agreement under Plaintiffs' construction would lead to unfair, absurd results as to Southwest Nut.  To demonstrate, if another tenant's use of the Warehouse in their *own* bay (i.e., Bays 5, 6, 7, 8, or 9) led to a fire that damaged the Warehouse, Southwest Nut could still be held liable, despite obvious evidence that it did nothing to cause the fire.  Though, in this case, it is unfortunate that

13

the origins of the fire are unknown, the facts demonstrate that Southwest Nut only entered into an agreement to incur liability for liability arising out of its own "use of the Warehouse." Therefore, just as it would be unfair to impose liability for the fire on Southwest Nut if another were at fault, it is equally as unfair to impose liability on Southwest Nut by mere virtue of the fact that the origins of the fire are unknown.[4] Therefore, the Court finds that the policy only required that Southwest Nut provide insurance coverage for losses occurring as a result of its own use of the Warehouse.

## CONCLUSION

For all of the aforementioned reasons, Auto-Owners and Martin's Motion for Summary Judgment (Doc. 76) is **DENIED**. Having concluded, as a matter of law, 1) that the lease agreement did not require Southwest Nut to provide insurance coverage for the entire Warehouse and 2) that the lease agreement did not require Southwest Nut to cover any damages not arising out of its own use of the Warehouse, and there being no evidence that Southwest Nut's use of the Warehouse caused the fire, the Court need not reach the merits of all other arguments made by the parties.

The Court does conclude that none of the policy provisions of the Travelers policy are applicable since 1) Southwest Nut could not have "acquired" the entire Warehouse, based on the limited scope of the lease agreement, and 2) the contract did not require that Southwest Nut insure the entire Warehouse. Based on these findings, there is no evidence to support the argument that Travelers' refusal to submit to Plaintiffs' demand

---

[4] The Court notes that Plaintiffs have failed to even present evidence that the fire was concentrated in Southwest Nut's area of the Warehouse. Based on the facts presented to the Court, Plaintiffs' liability arguments as to Southwest Nut appear to stem primarily from Southwest Nut's status as a tenant of the Warehouse. However, the undisputed evidence shows that a larger portion of the Warehouse was leased to another tenant, Camilla Commodity, at the time of the fire. (*See* Doc. 75-1 at 62-78.) Interestingly enough, at the time of the fire, the President of Camilla Commodity was Newell Atkinson (Doc. 75 at 4 12:23-13:8), the individual who negotiated the 2007 lease with Southwest Nut on behalf of Martin (*Id.* at 9, 30:7-18).

14

was made in bad faith.  Therefore, Travelers is entitled to judgment as a matter of law. Accordingly, Travelers' Motion for Summary Judgment (Doc. 67) is **GRANTED**.

Because the Court has found that there is no basis for imputing liability to Southwest Nut and/or Travelers, Plaintiffs' Complaint (Doc. 1) is **DISMISSED**.

**SO ORDERED**, this  27th  day of March, 2013.

                                      /s/ W. Louis Sands
                                      **THE HONORABLE W. LOUIS SANDS,**
                                      **UNITED STATES DISTRICT COURT**